Case number 25-7046. Muhammad Farhad Mia, individually and on behalf of Purpose Bus members, et al. versus Kimberly Clark Corporation, et al. Mr. Collingsworth, Mr. Simons, et al. Good morning. Good morning. You ready? Good morning, your honors, and may it please the court. I am Terry Collingsworth, and I'm with the National Rights Advocates, and we represent the 13 men who brought this case, who were among many victims of trafficking and forced labor, being moved from Bangladesh to Malaysia to work in various factories, including the Brightway factory at issue here. Kimberly Clark Corporation, I'll call them KCC and Ansel, have conceded that the 13 plaintiffs were trafficked and forced to work in the Brightway factory, and the issue here is whether they, KCC and Ansel, are liable with Brightway for the forced labor and trafficking. Overall, we're here to look at the scope of the Trafficking Victims Protection Act, the TVPRA. In doing so, I'd like to read a brief quote from the sponsors of the TVPRA, who filed a brief in the Supreme Court in Nestle USA v. Doe, speaking about the scope of the TVPRA. And they said, quote, it is not enough to target the traffickers themselves. Effective anti-trafficking policy requires disincentives directed towards those who benefit from trafficking, including corporate actors who knowingly profit from trafficking in their supply chain. And that's a 2020 Westlaw 6322316 at 19-20. And we submit that the scope, the intended scope of the TVPRA applies to both KCC and Ansel here, because they, according to Section 1595A of the Trafficking Victims Protection Act, they knowingly profited from forced labor in this case. Now, we have a lot of issues here, whether I'm going to briefly list whether there is a 1595A venture, whether KCC and Ansel should have known, knew or should have known of the forced labor and trafficking at Brightway, whether the statute applies extraterritorially in this case. And then we have common law claims for unjust enrichment and negligent supervision. I'd like to initially focus my limited time on the two factually intensive questions, whether there was a venture and the state of knowledge for KCC and Ansel. The issue of extraterritorial jurisdiction, of course, I'm here to respond to any questions, but it's well-briefed in our opening brief at 10 to 27 and the reply brief at 5 to 14. And we have an amicus brief filed by the Legal Scholars Group. But before you move off of extraterritoriality, so I'm going to RJ on this, so there are two ways. I guess it's called steps, not exactly steps, but either the statute as a whole applies extraterritorially or the focus of the statute could be domestic. So just assume for a minute that I don't think the statute applies extraterritorially. What is the best evidence that the plaintiffs have put forward that there is a domestic effect in the United States? Because the forced labor all occurred abroad. Right. Thank you, Your Honor. Well, I hope we're not done with the issue of whether it does apply extraterritorially. I think that the briefs in all of the cases, particularly in our opening brief at 10 to 11, we have about a dozen cases that say that it does extend entirely extraterritorially. But I think in terms of the domestic application, part two of RJ Reynolds, 1589B of the forced labor statute makes it an offense to benefit from the forced labor itself. And we think in the amicus brief and our brief both emphasize that 1589B clearly makes it a domestic violation if you benefit in the U.S. So benefits, it's just sufficient for it to be just commercial benefits, just profits? I mean, does there have to be some connection between those profits or some actions that the defendants have taken to show that they're in a venture and that, you know, that they're actually, shouldn't there have to be some greater effects domestically? Well, the question in 1595A itself is some form of benefit. And in this case, it is, in fact, financial. It's profit. They had low-cost gloves produced at a factory that was using forced labor and trafficked labor. So our argument under 1589B is that they, sitting in the U.S., received higher profits from the lower cost of that factory. And of course, that assumes they are in a venture, which I'm planning to cover. Do the plaintiffs allege anything other than profits occurred domestically? Well, they have the benefit of a steady supply source of cheap labor gloves from Brightway because of their long-term relationship with the factory. But at the end of the day, it is profit. They're benefiting from the cost savings of not having a factory that meets their own standards that they claim they try to apply. That's an argument that 1589B, the substantive law, applies to knowingly benefiting in the United States from trafficking abroad. That's right. And the lingo of extraterritoriality is to say that the focus of 1589B is on the knowingly benefiting. That's correct, Your Honor. But even if all of that is true, you still have to show that the cause of action applies. There's a step zero to RJR, which is you have to separately analyze substantive law and cause of action. And I mean, if you just apply RJR, the focus, even if you have domestic conduct, the focus of the cause of action is on the injury. And here, the injuries all happen abroad. No. 1589B expands the focus, which we did plead, to also whether the companies benefited from the forced labor. So the forced labor absolutely occurred abroad. But whether you benefited from it in the United States and it makes it a domestic application, it's in our complaint. And 1589B only exists. It would otherwise be redundant to make sure that the person benefiting from it in the United States is equally liable to the direct perpetrator. And that's textual. That's just an argument that extending the geographic scope of the substantive law determines the geographic scope of the cause of action, that there's no separate requirement of a domestic injury for a cause of action. Well, the domestic injury is the profiting from and— No, the domestic injury to the plaintiffs is being trafficked on the other side of the globe. Right. And that is their cause of action. That is not domestic. None of the injuries is domestic. None of the injuries are, but 1589B explicitly makes it— 1589B is substantive law. Yes. Just like in RJR, the substantive law of 1962 applied to domestic and extraterritorial conduct, and that didn't answer the question about the geographic scope of 1964, the cause of action for which the court said you needed domestic injury. So you didn't have a— Why doesn't that logic equally govern here? Because they didn't have an explicit statute like we do, 1589B, which simply says whoever knowingly benefits financially. And that's case— They had a legal code which incorporated predicates, some of which were just as extraterritorial as 1589B, and some of which were exclusively extraterritorial. 1589B is exclusively domestic, and that's what both we and the legal scholars established in our briefing on that, that it exists solely to allow for that domestic injury. And then if you look at the— Excuse me. The Rodriguez versus Pan American Health Association specifically held at 29F4706 at 716 that the financial benefit, I'm quoting, the financial benefit that violates 1589B is itself wrongful conduct and occurred in the United States. The Huffman case tends to support you on the proposition that 1589B covers domestic benefiting. Yes, absolutely. But that doesn't answer what's troubling me with your position, which is the difference between the substantive law and the cause of action, which is what RGR was all about. Well, again, RGR had two steps, and we think we satisfied the first step. The cause of action here, 1595A, used the word injury. That's what Judge Cassis is talking about, because it did use injury to business or property in RICO. It simply says an individual who is a victim of a violation of this chapter. It doesn't require an injury in the United States. No, it does not. Injury to property or business. No, it does not. It requires that the plaintiff be a victim of a violation of this statute. That's correct. And I think a plaintiff can be a victim of a violation without an injury from misconduct? They have to show that they were a victim of one of the substantive provisions of the chapter. And in this case, we're alleging they were both forced labor and trafficking. But 1589B does not require that we demonstrate that injury. It requires only that we demonstrate a benefit to ACC and ANCEL. Can you be a victim if your injury occurred abroad rather than domestically? Yes, if it applies extraterritorially. But I think— Is there any question that any of these—I hadn't thought at this stage that there was any question that any of the plaintiffs here were severely injured by the forced labor and trafficking? In the allegation of the complaint, we show that they were subjected to slavery-like conditions. They suffered physically. They suffered mentally. They, indeed, were very much physically injured by the actions that occurred to them and that are really undisputed in this case. I see I'm really eating into my— Let's put aside geographic scope. Just do you agree that the cause of action—the word victim in the cause of action requires both some kind of injury and some kind of causal relationship between the misconduct and the injury to be a victim? Yes, you have to demonstrate that you were injured by— you were a victim of one of the substantive causes of action. 1589 and 1590 are the two that are at issue here. I see that I only have three minutes left, and I wanted to— Even if we assume that the benefits could just be simply profits in the United States, why wouldn't the plaintiffs have to show that there was participation in a venture that occurred domestically? You know, something specific about how the companies participated in a venture domestically. I don't see any allegations of that sort in this complaint. I don't think we have to show that. I think we have to show that we have to satisfy 1595A that they were participants in a venture that, in fact, engaged in the forced labor and trafficking. So their participation—they don't have to be sitting in Malaysia to participate in that venture. We allege that they participated in it by investing in this factory and by supporting it across the years, and other indicia that we allege in the complaint of their support for that and their participation in the venture. So then there would be no limitation. I mean, basically, any domestic corporation could be held liable for forced labor abroad if they were participating in a venture. So there would be no extraterritorial limit at all under— According to 1589B, no. But there's a huge limit. They have to have first been participants in the venture that did the wrongful acts, and then if they did, they can't sit in the U.S. and say, we didn't do it because we're here in the U.S. No, you benefited from it here in the U.S., so that creates another form of liability. We do think that the entire statute, as we argue in our brief, is extraterritorial, which would remove that as a problem in any event, but we think that we can reach them in both prongs for extraterritorial— But if it doesn't pass—if it's not extraterritorial under prong one, then your reading of prong two would make it extraterritorial in any case where there was a venture. Because of 1589B, yes, which is explicit. I have one minute left for my rebuttal. I think I should stop or will the court grant me additional time? On the venture question, how do you distinguish Apple? Thank you. Feels like pretty similar. Well, as you well know, Apple has multiple prongs for how you can show participation in a venture. You can show a common purpose. You can share profits and risks. You can show control or a direct and continuous relationship. Any one of those will suffice, and the word or does indicate that. We think we satisfy all of the factors, and I can quickly run through the first one, which is a direct and continuous relationship. We have multiple allegations showing the simple fact of the years of KCC and Ansel using Brightway as a direct supplier. That's easy. But just briefly, paragraphs 1, 29, 30, 48, 69, 58, 101, 102, and 107 show that. I get that you allege how long this relationship went on. I'm just trying to understand. I did not read Apple as sort of saying it's just a question of time. As long as if you have the type of contractual relationship, the buyer-seller relationship that was going on in Apple, you have that and you just have to have it a certain amount of time. That's what you've alleged is how long, but I don't understand the relevance of that.  Well, I think the actual wording of Apple was a direct and continuous relationship. And continuous. Direct and continuous. That's a quote. But in this case, I acknowledge we could argue that that's enough. But I acknowledge that some other courts have said, well, you need a little something more, like to show that they had skin in the game or they were participants in some way other than just simply across the years buying the product. And we have that here. Paragraph 103, I will quote, KCC provided Brightway with a significant amount of Brightway's machinery and molds used in manufacturing latex gloves. Also, at one point, KCC owned one of Brightway's factories and sold it to them at a great discount to allow them to continue to produce. I'm just trying to understand. If I've got the history right, KCC was at, Kimberly Clark was at one point operating in Malaysia and then decided to leave. Is that when they sort of sold the company, sold the factory to Brightway? My understanding from our pleadings is that Brightway, sorry, KCC owned a factory for a while and Brightway was using it and then it sold it to them at a discount. Kimberly Clark left. Yes, yes. That was just where, so it wasn't like that from their long distance relationship in the United States as a buyer or seller that they said, oh, you need a factory? Let's buy a whole new factory for you. It's that they were leaving the country. They were selling. And they wanted it. Their factory was, and they sold it to Brightway. And gave them a bunch of equipment and materials to make sure that they could boost Brightway's- They gave new stuff or was it what was left in the factory? Well, that we don't know. We know that they gave them a bunch of equipment. And that's my point here about that issue, that paragraph one- I guess I can imagine it being different that if, in addition to being a buyer or seller, they were sort of sending in all kinds of equipment on an ongoing basis. But I'm trying to understand what your complaint alleges because it seems to me it's equally fairly read as, if not more fairly read, as Kimberly Clark had its factory in Malaysia, decided to leave the country, and it sold what it was leaving behind to Brightway or to the highest bidder, which happened to be Brightway. Well, they were partnered with Brightway and other factories before that. But a reasonable inference is that they gave them this equipment and they gave them materials and they've sold them a cheap factory in order to continue to boost and build Brightway's business. But the error here is that the district court- They didn't sell it to somebody. Well, they chose their venture partner to boost them, not anyone else. I mean, I understand why you're using that language, but I'm not sure. That's the allegation. Isn't this evidence, like the selling of the machinery, isn't that just further evidence of a commercial relationship, an ordinary commercial relationship? It doesn't show that they were participating in a venture to benefit from forced labor. Well, they knew about the forced labor at the time, and it shows that they wanted to help Brightway. And the legal error here is that the district court not only didn't take our allegation as true and give us the benefit of reasonable inferences. At page 1, at page 88 of the joint appendix, the district court dismissed that allegation and said that they provided, quote, off-the-shelf materials and machinery. That degraded the allegation. It didn't give us the benefit. So why is the reasonable inference that, you know, giving molds and machinery leads to an inference of participation in venture for forced labor? We have to show something more than a long-term and continuous relationship. So what we have shown is that KCC, much like in Salesforce, which provided direct assistance to the business that they were working with there, and here... But in Salesforce, they provided targeted help to assist them in their forced labor and trafficking advertisements. Well, here, again, we have allegations and well-briefed that KCC and Ansel knew or should have known about the forced labor and trafficking when they were doing business in a long-term and continuous relationship. And instead of giving it to somebody else or giving somebody else a deal, they sold this equipment or they gave the equipment and gave a good deal on the factory to build and boost this very business that they knew was producing cheap gloves because it was using forced labor and trafficked labor. And then in paragraphs 59 and 101, we have Ansel providing assistance to Brightway by helping them with their remediation plans in order to try to get from behind the withhold release order that CBP imposed to keep them in business because they were also their long-term business partner in a venture. Okay, well, so in Salesforce, the provision of something beyond just buyer-seller relationship was itself on a continuous basis, right? The computer... Yes. Right. Okay. But what you allege is a sort of one-off where we sold them the factory when they left the country, and they well have sold them the machinery and molds when they left the country otherwise. But you allege that they provided it to them. You don't say they were every year sending them new machinery and new molds. Well, shortly after this, the WRO occurred, and they then began trying to help Brightway to prepare remediation plans and also to be able to sell back in the United States. So that became their form of assistance, which obviously assumes that there was forced labor and trafficking. The WRO occurred. I'm not sure that just doesn't mean if you want to stay in business with us, you've got to clean up your act here. Well, they were directly helping them. And if it was a mere... By doing remediation plans, by showing them how to do it. Remediation plan. What do you mean? Well, in their own reporting in paragraph 59 and 101, NCEL said to the WRO, to the CBP that they're, don't worry, we're helping with the remediation plans. We're going to get them back up to speed. Doesn't that mean they're only setting standards for them? Better forms of enforcement, better forms of monitoring so that there would not be forced labor and trafficking in the future. And if they were just mere purchasers of these gloves from Brightway, they could have gone to anybody else. Did your complaint allege... I thought your complaint alleged that the forced labor and trafficking issue here sort of ended at the time of the WRO. Am I wrong? As to these plaintiffs? As to the plaintiffs, yes. So what happened after that? The plaintiffs? No, what you're, all you're talking about, all this stuff about remediation is something that co-states the plaintiffs and their asserted injuries. And so... That's just evidence, Your Honor, that they had more than a mere buyer-seller relationship. They were working with Brightway to get them back online so they could continue doing business with them. If they were mere purchasers and didn't care who they bought their gloves from, they could have gone down the street to XYZ Factory instead. But they stuck with Brightway because they had a long-term relationship with them and they were in a venture together. And a relationship with a buyer-seller relationship. Long-term buyer-seller relationship. With the kind of assistance that Salesforce pointed to to show that it was more than that. If it was not more than that, they could have gone anywhere else and bought gloves from anybody else. They didn't. One or two questions on Justin Richmond. Do you recall, do you handle the case in the Ninth Circuit against Walmart, Doe versus Walmart? I did, Your Honor. So the unjust enrichment claim in that case seems similar to the one here. Do you think, in order to rule in our favor, in your favor, would we have to conclude that the Ninth Circuit misunderstood the law of unjust enrichment? Or can you distinguish it? Well, I think the main difference is that here, with the Walmart case, we had a number of different settings. Here, we're focused on one factory where there's no doubt at all that across the long-term relationship with Ansel and KCC, that they benefited from this cheap labor coming out, sorry, cheap gloves coming from the Brightway factory because of forced labor and trafficking. I think that direct relationship, the ongoing benefiting from it is different than Walmart, which was really more of a one-off situation. Suppose I hypothetically think that there's no participation in a venture here. Would that change your answer? No, we specifically do not require that there be a venture. That doesn't mean that if there's not a venture because it was just a long-term relationship where they were buying the gloves and getting them cheap, that would be one thing. But it would not mean that they're not unjustly enriched if they are receiving the benefit of those cheap gloves that are cheap because of forced labor and trafficking of our plaintiffs and others similarly situated. Okay. Thank you. Was the Ninth Circuit interpreting D.C. law? No, it was not. I was going to add that. Thank you. We do cite D.C. cases for the unjust enrichment elements. What's your best case? D.C. or otherwise for applying unjust enrichment law in a context where the benefit flows from a seller to a buyer to a downstream buyer. Thank you, Ron. Things that, at least superficially, look like market transactions. Can I give you that case? When I stand back up, assuming you're going to give me one minute or more for a rebuttal. How much time could I have for a rebuttal, please? Well, for that, is there anything more you want to say in response to the question? I just want to answer it on rebuttal. No, I have good cases. I want to just go get them and I'll stop wasting your time now. Thank you. That's okay. Any other questions? Maybe when you stand up, you can also say something about choice of law and why D.C. law is the correct law to apply here. Is that disputed in this case? No. That would be my short answer. It's not disputed and D.C. is where we filed the case and the defendants have not challenged jurisdiction or venue and that's where the case is cited. And are there cases in D.C. holding that D.C. common law claims apply extraterritorially? There are. There's no challenge on that basis either, Your Honor. And they do. The common law, the rule of the presumption against extraterritorial jurisdiction has not been applied to D.C. state law and defendants have not raised that here. Well, is the unjust enrichment extraterritorial? Or put aside your venture theory, I had thought it was simply benefiting from domestic benefit, much like your 1589B argument. No, that is correct. But just in the abstract, I don't think there's an issue of whether these laws apply extraterritorially. Thank you very much. We will give you some time for rebuttals.  Good morning, Your Honor. May it please the Court. I'd like to come back to the extraterritoriality issue, which was the focus of a number of the Court's questions. But if I could start with a question of participation and a venture. And Judge Millett, you asked, you know, that doesn't seem very similar to the Apple case. And it does. The plaintiffs had an opportunity after Apple to amend their complaint to try to meet the standards that this Court set in Apple. What they came up with was eight paragraphs, paragraphs 99 to 107. Mostly, they recite several times that this is a buyer-supplier relationship. What Apple held is that a buyer-supplier relationship is not enough. Plaintiffs say you have leverage. You could have, you know, withheld your purchases. You had audit rights. Apple addressed those things. It says you can exhort your supplier. That's not enough. You can have audit rights. That's not enough. For Ansell, which is one of the defendants here, that's it. It's just the buyer-supplier relationship. With Kimberly-Clark, all they add is this incredibly cursory allegation in paragraph 103. Which is okay at this early stage. Cursory is okay, but it sort of only gets you as far as you're able to allege. So the question is, what is a plausible inference that you can draw from the allegation that, for example, you know, some machinery was provided? Even a significant, I don't want to, you know, shortchange the allegation, a significant amount of machinery was provided. How much exactly? How did that help right away? Was that integral to his business? You know, the plaintiffs have been shorthanding this idea. You had alleged the provision of, I assume there was only one factory or more than one? Your Honor, I can only go based on the allegation. They said at one time, Kimberly-Clark sold a factory. But are the machinery and molds provided on an ongoing basis? Updated equipment? Your Honor, this is, I think, where we get into the issue of the cursory allegation. I don't know. Well, what's a fair inference from the allegation? A fair inference is that, at some point, significant amounts of machinery were provided. I think even if that was ongoing in a continuous way, I think the only natural inference I can think of is that, you know, as Judge Rouse suggested earlier, this is what happens in buyer-supplier relationships. You know, it's one thing to say, I want a bunch of... But that was done on an Apple. That's a big difference from Apple. No, Apple wasn't providing anybody machinery. Little factories. No, Your Honor. The question is, you know, what Apple said is you need more than a buyer-supplier. But computer services, continually, you're in trouble under Salesforce. If you provide equipment continually, if that's okay, that would seem an odd distinction. Your Honor, I don't read Salesforce as saying if you continually provide computer services, period, then you're participating in a venture. Salesforce had incredibly detailed allegations about the growth... Is that the... What makes you think Salesforce is the bare minimum as opposed to an easy case? Your Honor, I'm not suggesting that it's the bare minimum. I'm following what the court said in Apple, which is this isn't the type... The plaintiffs have said, if you have a direct and continuous relationship, boom, you're a participant in a venture. I don't think that's what Apple said. It said, if you have the type of relationship, that was at issue in Salesforce. And so I'm not saying that Salesforce is the bare minimum. But when you look at what it was about at this court, it was about the Salesforce involving itself in the operations of a sex trafficking website. Isn't that if you... I mean, if you are constantly providing the... Beside the factory, the equipment, updating in some new stuff every year, plus the buyer-seller relationship, your position is that that's what normal buyer-seller contracts do? Well, your first... And I take that maybe to be a hypothetical because the constantly point is not... But if that... That's the question that I asked you. I thought you were saying not good enough under Apple. And that is the very question I'm asking you. Sure. And I think it would depend on all of the facts that were alleged. And the reason I say that is because I take the North Star of Apple to be that the plain ordinary meaning of participation in a venture is that you are in a shared enterprise. You are sharing opportunities for risk, for profit, and you are sharing in the risk of loss. So I think the question is... Investing. I mean, they were investing money in this... Apart from their buyer-seller contract. I mean, that's at some level... But put that aside. They also were investing money every year in the company, whether in the form of just giving them capital, or giving them equipment, or giving them high-tech computer services. I'm just... Right. I think... This is why you are resisting that that would be different. I think it might be with enough facts alleged. I'm telling you the facts. Okay. It seems as alleged and whether that could be good enough for a complaint. And that is, as I said, on an annual basis, they are sending in capital investments, equipment, physical manufacturing equipment, high-tech computer services. I think it would depend. Is it only to use for the particular product that Kimberly Clark wants, in which case... They're not making factories. As far as we know, that's all they do. Well, but is it because Kimberly Clark wants their gloves made to a particular specification? And so the same way, for example, if you had a t-shirt factory... So you think that's what matters. I think it's relevant. I think because I think it's relevant for sharing... But it's not specialized. It doesn't have a Kimberly Clark embossment on it or anything. But someone could be actually sort of co-running this business, throwing money and equipment and technology at it. Your Honor, I think once we get to... If you are... Once you're able to plausibly infer that you are co-running the business, then I think... Well, that's my label on what this is. When you are providing all of the... Or lots of, as people say, a significant percentage of the equipment. Assuming they're the high-tech services and a significant capital contribution, I don't know why you're resisting that. Your Honor, I guess the question is just whether it's plausible at that point... What does it mean to be at risk? I mean, that's a lot of sunk costs if the business goes belly up. Well, I think... There's a WRO against them. That's a lot of stuff you've invested there that's gone. That's not a vengeance? I think I would say that I will acknowledge that at some point, if you have enough in there and you have enough riding on this and you're a profit...  Yes, I'm not sure, but it's not the one sentence, a significant amount of machinery. I think these things get done on a case-to-case basis. I think Salesforce is instructive when you talk about... They've said a significant amount of machinery, and it's unclear from the complaint whether it was continuous or not. It's just not specified. Do we have to write the opinion and say we infer it wasn't continuous? We infer that against plaintiffs, and so we won't find a venture here? I think, Your Honor... But if they did say continuous, then we would infer otherwise? I don't think continuous is the be-all and end-all. I think what does it do to the ultimate... You know, I think the question would be... I think what Your Honor asked, that it rises to the level of basically operating the business together. You know, I think that could be a workable standard, and the question is... I think the conclusion that comes from being a venture is that you're... We both got skin in the game. So I don't think you can say that that's the test. I think that's the conclusion. So I'm trying to understand what you think the test is in an opinion where we do have a different allegation than Apple, what it should be for a venture in this context. I think, are you... You know, is the amount of machinery that is being provided so significant that, you know, one, is this true? They use significant. They use that word. They do use the word significant. I think that's the conclusion they put in there in their one-sentence allegation. Is it so significant that you're... Describing volume is actually another way to think about it as a factual allegation. Sure, Your Honor, and, you know, in Apple, the court referred to, you know, unspecified amounts of purchases. There's sort of... That was just buyer-seller. I think there was even another in-between person there. That's not what was going on here. Sure, Your Honor. I think it would look to a couple of things. Are there allegations that this is something that ordinary buyers and sellers don't do? That's not alleged. I'm not one of those businesses. I didn't know that ordinary buyer-sellers, you know, arms-length relationships a la Apple, are sending, donating, giving significant amounts of machinery and molds to the manufacturer. Is that... Am I wrong? Is that normal? Well, Your Honor, it's just... Does Kimberly-Clark do that? Or Ansel? You said Ansel didn't do it. It doesn't seem like it's part of their business. Kimberly-Clark... I mean, one thing you should know is that your client does that routinely to, say, domestic manufacturers. As I understand it, it is normal to have a sort of bailment arrangement where someone is making products for you, and you provide a particular piece of equipment to use to make, you know, that product to a particular specification. It's like if you want to... Why is there a VA on this equipment? Your Honor, we're now getting past, you know, beyond the complaint. But Your Honor asked, you know, if my understanding as to whether this is normal. My understanding is that in these business operations, it is, but there's certainly no allegation that it's not.  Well, Apple is a different industry. That's sort of mass production of commodity. I'm not here to say that Apple has exactly the same fact. I certainly wouldn't say that. What it does is have the test. So were the molds... Well, I know, but that's why I'm struggling with trying to apply that test to different facts. That's what this case is about on the venture issue. With the molds, were they Kimberly-Clark specific then? Did they have a little Kimberly-Clark design on it? Is that why they gave them... I don't know how much of a mold you need for a glove. If they had their own specific gloves. It sounds like then what is maybe normal is you give them equipment for manufacturing your gloves, but not Hansel's gloves or anyone else's gloves. Is that what is meant by the machinery and molds? Your Honor, if we're talking about the allegation, the short answer is I don't know from the was provided what they think that it was used for. We don't know the amount. We don't know the purpose. We don't know is it ordinary or is it not ordinary? And we don't know, again, I think Salesforce is instructive in the sense of are you sort of so enmeshed in the business that you are having an effect on the ability for Brightway to run its business? Not just can you fulfill the contract for Kimberly-Clark. Is this rising to the level that you are enmeshing yourself in the way that Brightway is running its business? So I think you could have had allegations. So, for example, with Kimberly-Clark, the only customer, was there a fivefold growth like there was in Salesforce or even, you know, double growth it did when this when this factory was sold or when these when these machinery was provided. We thought Hansel were two-thirds of the purchasers of the gloves from this factory. I don't think that's been alleged, Your Honor. We know. I thought it was in the record that the only other purchaser was the National Health Service. The plaintiffs don't allege anything about how many people, how many other buyers there were. We know from a press report that is incorporated into the complaint that the National Health Service of the U.K. was another buyer. I don't see anything in that article or in the complaint that says those were the only three buyers. It's just more and more and more. So one thing I was suggesting was, you know, before Kimberly-Clark was involved was Brightway's operation not at scale. And then we also have an allegation that Kimberly-Clark and Hansel stopped buying gloves. Did Brightway collapse? What happened? That would have been very, very relevant to understanding what is exactly the nature of this supposed dependency on the factory, on the machinery. There's just so little here. And I do think I completely appreciate, Your Honor, that you want to write the opinion and know exactly where to draw the line. Careful, because at some level, you know, these are victims of slavery, forced labor, trafficking. There has to be a line between they've said enough to get past the 12B6 stage, but the other stuff is information that they're not going to know. It's lots of economic injury. Business information is not often shared with your forced employees. You know, and first of all, I would want to say Kimberly-Clark and Hansel take allegations like this very seriously. And the point here is, you know, not should there be any response to these allegations of forced labor and supply chains. Congress has taken a number of steps. You know, you have the system working with the withhold release order here. And immediately, as the plaintiffs alleged, Kimberly-Clark and Hansel, you know, cut off their ties and stopped buying the gloves. The question here is, you know, this is a statute that Congress enacted, and we've got to, you know, give it its faithful interpretation. Congress, at times, I heard Mr. Collingsworth basically describe a form of liability, where if you know that something is going on in your supply chain and you buy from that supplier, then you're liable. It would not have been that hard for Congress to write a statute like that. It used a very particular formulation, participation and adventures. I do think, you know, the court, you know, was right in Apple and in sheer demand that the plaintiffs, you know, really make a showing that this goes beyond the buyer-supplier relationship into something where it looks like it is, Your Honor, well put in business. But the same venture test would apply domestically to a domestic-level manufacturer. Yes, Your Honor. I think, you know, that's the venture test that was applied that was, you know, succeeded in Richio, succeeded in Salesforce. So I don't think, you know, our approach here was suggesting that we were wrong. Okay, but that's back to the, yeah, it succeeded there. Those things seemed like, if anything, it was a venture that was. But what we need to understand is what is the distinguishing line here? And it can't be that you have to have all that much of the same showing. That seemed to be more than enough in those two cases. Your Honor, that was certainly enough in those cases. I agree this case is sort of somewhere in between, say, Salesforce and Apple. I think it is a lot closer to Apple than it is. It's a Salesforce. And of course, you know, case by case, you know, judging there will be, there will be distinctions. You have to decide, you know, which side of the line it falls on. And, but I will say, you know, the question of, you know, under Twombly and Iqbal, you know, it is the burden of the plaintiffs to allege enough. And I think these two sentences about some machinery in a factory one time is not enough to say under the standards, the plain meeting standard, this court adopted in Apple, that's not enough to say you were fundamentally in business together, you were in it together, your risks and your profits were rising and falling together. I see I'm out of time. I was hoping to address extraterritoriality, but I'll let the court say. I just have a question or two on unjust enrichment, which I think is a tougher claim for you, because there does seem to be some authority for the proposition that if a plaintiff under confers a benefit on a defendant and that gets passed, passed down a chain, the plaintiff can sue an indirect beneficiary. For your, I'm interested. So suppose for purposes of this question, suppose I think your colleague on the other side is right, that knowledge was adequately pleaded. So you have Brightway being unjustly enriched through this forced labor, and then the defendants here knowingly taking advantage of that and being, they say, unjustly enriched through buying these products at a discount, reflecting the forced labor. I mean, there's a lot of factual assumptions in that. There might be hard questions about how the markets work and stuff, but I didn't see an obvious legal roadblock in unjust enrichment law to prevent them from trying to make an indirect unjust enrichment claim. So help me out with that. Sure you are. And so I think the way I would think about this is not direct versus direct, but it's their confer versus indirect. It's with their conferral of a benefit from the plaintiff to the defendant. So I'm interested to hear what case Mr. Collingsworth comes up with as his best case. I suspect it will be a case that's about money. A pays a premium to B, B kicks it over to C, A is able to sue C to recover that premium that was paid. You know, B and C are in a scheme together. They managed to build A out of some money. B is the one who initially collects it, gives C their share, then A sues C. Easier case if B and C are in the scheme. Much easier case if they're in the scheme, even if you allow- Even if they're not in the scheme. I mean, I was really trying to think, like, what is the right legal doctrine to decide how far down the chain you can go? And, like, one possibility might be, is C a bona fide purchaser? And that would seem to turn on, did C have notice that it was acquiring something illicit? And on this hypothetical, I'm assuming notice. I'm assuming knowledge. Sure, Your Honor. So let me suggest maybe another way of thinking about it, which is if you distinguish these money cases- Why is that way of thinking about it wrong, too? Sure. So I think, let's think about what is the benefit disconferred? In these cases where you're sort of following the money downstream, it's money. You can trace, you know, A paid $1,000 and maybe it stopped with B or maybe it stopped with C. It's a discount reflecting unreasonable cheapness of labor because of the horrible conditions. Yes, but I think it becomes different when you're asking about, you know, the way that unjust enrichment doctrine is phrased is in terms of conferral of a benefit. So the question is, what did the plaintiffs here confer on anyone? What they conferred on Brightway was their labor. And they alleged that they did that under horrible conditions, and we absolutely are condemning that. Brightway benefited from the conferral of labor by the plaintiffs. So the question is, you know, if the plaintiffs had given $1,000 to Brightway, then Brightway shared some of that with Kimberly-Clark and Ansell, maybe we're talking something else. I don't think it quite works to say the labor was then conferred from Brightway. Brightway received the labor, and then they sort of, you know, conferred down the chain that labor onto Kimberly-Clark. Yeah, I'm not an economist. It doesn't seem unreasonable to think of it that way. And I mean, I'm not sure if it's the supply curve or the demand curve, but unless there's complete price inelasticity, some of that is going to get passed on, right? But I think that's right. But some of that value will be passed on to the indirect purchaser. And I'm just not familiar with any unjust enrichment case, certainly not one that the plaintiffs have cited that goes that far. I'm not either. I just can't think of the legal magic bullet to say that there can't be one. Because I think, you know, now we're very much in the realm of common lawmaking. And I think, you know, we look at, you know, I think the fact that what we're now getting into these complicated econometrics and things like that is a pretty good reason, you know, sitting in diversity. I guess this would be supplemental jurisdiction. You know, I think the court, if it reaches that question, would have to ask, is that really, you know, a step that the common law is supposed to go when adjudicating that claim really would require, you know, a common law court to ask these questions about inelasticity of markets and prices and supply and demand curves. It gets really complicated. And I think it gets into questions. We haven't at this stage raised extraterritoriality issues. I think those do loom here. And the other thing that I would say is that we have a statute. Congress, you know, passed a statute that says, we don't think there should be a sort of general abstract unjust enrichment concept for supply chains where lots of people down the chain might be buying something that could be, you know, tainted at the start. The, you know, I think the question is, I think a reasonable question for a common law court to ask, should we extend the common law to do all of these complicated economic things in an area, you know, that gets into questions of foreign relations? And, you know, Congress has taken a different approach and a narrower approach. I think that there's a lot of reason for caution, you know, before extending a common law claim into something that really hasn't been seen in the common law before. Well, do you think the D.C. Court of Appeals follows the restatement? I think it does. Restatement third says, if the claimant renders to a third person a contractual performance for which the claimant does not receive the promised compensation and the effect of the claimant's uncompensated performance is to confer a benefit on the defendant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment. That sounds like exactly this case. Your statement is restating common law. Right. Now, whether it's, whether those factors are met, whether the enrichment was unjust or not, knowledge, innocent buyer, those things. So, but it seems to me at least the principle of law that Judge Casas has been asking about that I agree with you, I think the D.C. Court of Appeals does follow the restatement. The restatement articulates in the exact terms of this situation an underpayment to the laborer that allows for a cheaper product to the purchaser, allows for a claim against unjust enrichment against the purchaser. Sure. Your Honor, I may have missed part of the quote as you're reading. I didn't share anything specific to a laborer. Maybe I missed that. Contractual performance for which they're not compensated. And that could be, you know, the sale of land and any number of things. I guess what I'm saying is just. But they don't limit it to that. Sure. And so I think, you know, restatement is a good place to start. And then one more. Well, you were just saying, remember, of any common law principle. And it just seems to me that since the restatement's saying that, making that point in a number of different ways, it's something one would need to at least take into account. I mean, the district court's ruling here was simply a flat can't ever happen. If that's incorrect, then that's an error. Your Honor. Without an analysis of whether D.C. Court of Appeals follows the restatement. And then whether the restatement articulation was part of the situation. Sure. You think it might be a difference between wages and land? Your Honor, I think, you know, the principle. I think, you know, common law adjudicating is all about, you know, how these things apply to different sets of facts. And I think you'd want to, I guess, I can think of a lot of situations where there is, you know, labor is provided. For example, your Fair Labor Standards Act. Someone doesn't pay overtime. The chicken farmer doesn't pay their workers overtime. You can have a fair, you know, an FLSA claim against the producer. Could you have an unjust enrichment claim against a giant supermarket and say, you know, the laborer conferred a benefit on the poultry manufacturer and they passed that along as uniformity appraised to the grocery store? Did they know about it? I suppose, Your Honor, that just happened. I'm just asking you. I'm not saying that's what happened here. If they knew about it, the two of them were, all right, we won't pay them that so that your gloves will be cheaper and then you'll have a higher profit margin when you sell them to hospitals, doctor's offices. If there were such knowledge of that sort of passing along a financial benefit, knowledge and intent, what's the objection? I think the objection is just how complicated it would be to create benefits. Court law does intent all the time and knowledge all the time. It also deals with innocent owners. It deals with bona fide purchasers and not bona fide purchasers. That wasn't complicated. This is what happens in the law all the time. And you want to make some global rule that even if someone intentionally, knowingly engaged in this contractual relationship where you cheat them and that will let you give me a lower price and I am untouchable, the law can't handle that? I think the law can handle. I think, you know, some version of what Your Honor just said, you know, and that, you know, starts to look like these cases where it's, you know, the premiums are collected and you're kind of sort of all agreeing to bilk someone. Are you adding more factors and makes it more workable? I think... Is it a scheme now? What, no, Your Honor, I think the, you know... I mean, your case is a little more complicated because you talked about a statute, so there were all kinds of issues about common law related to that. But let's just assume instead it was a common law. Underpaid this person, grossly underpaid them. Right, I think it's... That's the law promised them. I'm not disputing the courts can't handle knowledge and intent. I'm talking about when you start tracing, you know, the value of labor through a supply chain, you know, and does it stop? Enrichment has been around for a very long time, as have labor supply chains, and it hasn't been a problem. So why is it suddenly a problem now? Your Honor, I think it hasn't been a problem because I'm not aware of cases like this. You're talking about the TVPRA. I'm talking about... No, Your Honor, I'm talking... I'm sorry. No, don't. So I think one is, an awful lot of times, it's an innocent buyer that cuts it off right then and there. You don't have the knowledge. I think that, and I guess I'll take that. I think that could be one way out in this case, because we don't think what they allege here is that the audit didn't... They definitely are not alleging. There's no allegation here that suggests that, in their view, Kimberly-Clark and Ansel are innocent purchasers. Exactly. Alleged exactly the opposite. Well, they do. Respectfully, they don't. If you take the complaint as a whole, including what the district court found unchallenged to be materials incorporated by reference, the audits, the third-party audits that were provided to Ansel and Kimberly-Clark found there was not forced labor. Okay. If that's how you might read it, I'll take a different one. Can I just ask you a question on extraterritoriality? Okay. If we are operating under the second prong of RJR Nabisco, is there any way for the plaintiffs to allege that the focus of the statute has a permissible domestic effect? What would they have to allege to show that? Well, Your Honor, what the Supreme Court has said, as you look at, what is the focus of the statute? What is the object of its solicitude? Who is it trying to protect? I think the obvious thing that this statute is focused on is forced labor, and it's trying to protect people who are victimized by forced labor in trafficking. So then you would look to where does the conduct relevant to that focus happen? I appreciate the plaintiffs want to say it's the benefit. I have a couple of things to say about that. Doesn't Congress, in part, say it is the benefit, right? They don't want companies benefiting from participation in a venture that involves forced labor or trafficking. Sure, Your Honor. I agree that is an element of the statute, but that's not the end of the focus analysis. I think Your Honor asked a good question before. Why is the focus the benefit and not the participation? The actual statutory phrase is not knowingly benefit from the forced labor. It's knowingly benefit from participation in a venture that has engaged in the forced labor. So perhaps plaintiffs here have not alleged enough, but do you think it's possible where the forced labor occurs abroad for there to be liability for a U.S. company domestically? Your Honor, I— Is it possible? I don't think the— Like if there was evidence, say, of participation, like if there were venture activities that occurred domestically, would that bring it—would that make it possible to sue a company in the United States? Your Honor, my position is that the focus of this statute is the forced labor, and so the question is where that came in. I don't think the court necessarily has to reach that question today because, you know, I think you could leave open the question of whether participation in a venture is enough. I think you'd have to wrestle with things like Doe versus Nestle, where the court says, well, it's not enough to have corporate decision-making in the U.S. that causes these harms abroad. I think that might be a complicated issue with that theory. But if you had, you know, real significant— perhaps one could say that the focus of this provision is the participation in the venture, and so if you had, you know, a lot of participation activity in the U.S., again, this is not my position. I think the focus is the forced labor, but I could imagine that position, and it still wouldn't be good enough for the plaintiffs here. Are you running away from your other argument that the focus of the cause of action is the injury? No, Your Honor. I think, you know, the injury is being subject to forced labor, so I think that is maybe just another way of phrasing, you know, what I was trying to say, or at least I hope so. Well, you said the focus was being a victim of forced labor. Yes, that's right. So if the focus is on—when I say forced labor, so the statutory violates forced labor victimhood. That's what the cause of action is focused on. I think that's right. That's what—I mean, just from top to bottom, that's what everything about the statute is focused on. You know, who is the object of Congress's solicitude? It says that, you know, Your Honor quoted this language before, the victim of the violation. So I think, you know, who is the victim? Where were they victimized through forced labor? If that is the exclusive focus of the statute or the primary focus of the statute and under the way we think about that under RJR and Nabisco, then there would never be liability for a U.S. company for forced labor that occurred abroad. Because the victim, you know, the injury and the victimization would all be overseas. I think that's right. I think, I mean, I could imagine, you know, one thing that Congress was very focused on when it passed this law, there's a lot of immigration-related provisions. So I can imagine transnational cases where there's sort of trafficking that overlap, that happens, kind of continues from one country, you know, starts in the United States and somewhere else starts in a different country and comes into the United States. So I think that could be right. But I agree, Your Honor. Then there would only be liability for U.S. companies where the forced labor occurred domestically. I think that's the consequence of what the Supreme Court has applied, you know, time and time again, you know, muscular presumption against extraterritoriality for very good reasons. You know, as Judge Katsas was alluding to before, it is a very big step to go from criminal, you know, a substantive offense that is criminally prosecuted by a United States attorney who is accountable to the executive branch. In some circumstances, by statute, you're supposed to have the express sign-off with the attorney general and the deputy attorney general. Supreme Court said it's a very big step to then turn this over to private plaintiffs, you know, to sue over things that happened in different countries. And so you need... Supposed to be the pronged one of RJ or Nabisco. Well, Your Honor, it does, Your Honor. But what all... As to whether there could ever be, you know, permissible domestic application of the statute. No, Your Honor. The only thing I would just, you know, add to that is what, you know, is the court, you know, at applying this step to, what it has said a couple of different times, that the presumption would be a craven watchdog indeed if you were treated into its kennel as soon as you had sort of any hint of something domestic. So I think in applying the FOCUS standard and giving it its due, the court is very much, you know, focused on making sure that you don't just have... You sort of... You know, throw out the presumption and the important work that it's doing, you know, by being too lax about looking to, you know, domestic conduct that you say, you know, would meet the FOCUS. I think that's why... And I guess, you know, my broader point here is this is a fundamentally a decision for Congress. And that is something Congress could decide. Did it think that actually, you know, private plaintiffs should be doing these things? And if Congress, you know, thinks that that's not the right result, the Supreme Court has told it what to do. Speak more clearly. Just to be clear. So if you had a company that was in the venture of all ventures, with a right-of-way, kept their employees, had their own employees on the ground there, had... Gave them all the equipment they need, had the contractual connections between them ongoing. I mean, it puts Salesforce to shame, the structure that I'm hypothesizing to you. And we've got the memos from the company here in the U.S. saying, gosh, too bad, we're going to have to pay just wages. Wait, how about we outsource it to this company we're going to set up over here? So we are a venture of all ventures. And your position is we don't think Congress wanted that? You thought that? My position is... Yes or no, out of extraterritoriality. Does the statute apply to that situation or not? The civil cause of action does not. That company needs a very good white-collar lawyer because they are in a lot of trouble under criminal laws. They can be enforced. It may be nothing. So, you know, it's a lot. Our prosecutors have a lot, jury judges have a lot on their plates for prosecutions. So maybe, maybe not. Right. But Congress didn't mean to stop that through civil cause of action, only through criminal enforcement. That's how I read the statute. I think Congress did not speak clearly enough to overcome the presumption against extraterritoriality to reach that... You did that because you said the way you were defining focus was solicitude. Who does Congress have solicitude for? These are the victims. I feel bad for victims. Why isn't the focus inquiry? What did Congress want to stop? What did it want to use every tool at its disposal to stop? Well, thankfully, we're at a point where maybe what they wanted to stop was slavery, trafficking, sex trafficking, teamage. And those companies in the United States, President of the United States, nationals of the United States, who knowingly engage in a venture and profit from this process. And you want to say, no, that's not what Congress... It was just one, you know, we feel bad for victims in the United States. Now, if I look at the statute as being, the focus being make this stop, we are not going to have... The United States is not going to be a part of this system. And we are using criminal and civil tools at our disposal. Does that change the extraterritoriality analysis? Or not the extraterritoriality, the prong-to analysis of RJR? If you look at it, it's cut it off. Yeah, I guess the question is, what is the it? You know, if the it is the forced labor... Forced labor, slavery, sex trafficking, all of the criminal offenses. It's pretty clear what Congress wants to stop. It's a lot for Congress to say, we're going to apply this overseas. It's a lot to do. And to say, we want it to stop. And then to say at numerous points in the statute, and you can't wash your hands of it in this country. You can't outsource it. That will be stopped too. And we will use both the government's own enforcement capacities and private enforcement. Because that is a very effective way of making conduct that is reprehensible to the United States. So, that's what the statute does. I think we're right in the court of Grabbaman. Tell me why I'm wrong. Well, I would say the question is focus, not Grabbaman. When I was using the phrase object of...  Stop this. Yeah. This conduct. And do not benefit from it in this country. Your Honor, I think there's two different parts to it. There's the disconduct, and then there's the benefiting from it. I am totally with you. Congress thought this was absolutely atrocious conduct. And I agree with them. Kimberly Clark and Ansel agree with that. Congress wanted to stop this horrible forced labor, peonage, trafficking, slavery. So, the Supreme Court says, if that is the focus, where is the conduct that is relevant to that focus happen? And it happened in Malaysia, in Bangladesh. Where I disagree is to say also the focus in that core sense where what the Supreme Court has told us is this is not... Not that core sense. There's two. There's another focal point. And that is nationals of the United States that knowingly benefits by participation in a venture that's doing this. That's a focus too. They added it in multiple locations. That is a focus too. It's stopping not just Malaysia from having companies that do it, but having companies here knowingly financially benefit from it. I don't know how you can say that is not part of the focus. Yeah, it's certainly part of this statute. But it's not part of Congress's focus. I say, when you look at the statute as a whole, when Congress added this in 2008, it added the knowing beneficiary liability to 1595 at the exact same time it added 1596 and extended extraterritorial criminal prosecution. So I think when you look at the focus of what Congress is doing, you put aside the step one, step two, just look at a whole at the statute. At the very same time that Congress was expanding civil liability to beneficiary... You don't have to do the solicitude test. And to look at the focus, we have to look and see whether... So what your test is, we have to look and see whether this and thou shall not benefit from it financially knowingly in this country. We have to say that wasn't part of the focus. Your Honor, I think what I'm applying is the Supreme Court standard for... Can you please... So your analysis says that was not part of Congress's focus. The focus of the statute is the forced labor is my position. Okay, not all hands on deck to get rid of it. Your Honor, a lot of hands on deck, criminal prosecution, withhold release orders, a lot of the forces of the federal government... Not sort of private right of action that the Supreme Court has said causes a risk of international friction and that Congress needs to be clear if that's what it's going to do. This friction is nothing like the frictions the Supreme Court has talked about. The frictions I've talked about, one, travel damages, which aren't allowed here. Friction is, well, other countries might have their own way of regulating these things which are predominantly economic activities in our Genovesco, Morrison, Epigram. I disagree. We think Congress here was worried. I mean, it's not... First of all, foreign affairs is something we defer to the political branches. Congress passed this, President signed it. Congress strengthened it, President signed it. And so when we start emptying it, we're stepping out of our role. When we start emptying it of the force that we can tell that we discern Congress intended, that's not our role either. And if we assume there's no solicitude on Congress's part, an assumption that it's okay for other countries to make a different choice about forced labor, slavery, sex trafficking, that's not an area, unlike the other cases Springboard has talked about, where they want to be solicitude of other countries. If they wanted to be solicitudes of other countries, they would not be authorizing the federal government to go into those other countries and start prosecuting people. Well, Your Honor, they authorize the federal government to do that with particular checks on prosecutorial discretion involving the express sign-off of the Attorney General and the Deputy Chief Attorney General. There are ways responsible for criminal prosecutions by United States. Yes, that's a big deal. It sure doesn't suggest solicitude for other countries making different regulatory judgments about whether to come down hard on these practices, unlike the other cases before the Supreme Court. Sure, Your Honor. I think that all I will say is I don't think the Supreme Court, you know, when it talks about, you know, international friction, you know, it is not just disagreement about, you know, conduct or not. We spent a lot of time on tribal damages. We talked about the regulatory, you know, the tension was, well, other countries are regulating this conduct, but they have different line drawing, different ways of bringing that to bear. But no one's arguing here that that's what's being stepped on. Your Honor, I think there's also questions of capacity building and, you know, bringing things into the United States as opposed to abroad. When you look top to bottom at this statute, there is federal foreign assistance to countries that help them investigate and prosecute. There's sticks, there's penalties on countries that don't conduct, you know, proper actions. There's a lot of foreign relations in this statute. And again, I think ultimately it just comes down to a presumption. Congress said, you know, it may be right that the right answer that the political branches would give is that we want private rights of action here. We want people enforcing this, you know, through a private right of action. That's something that Congress needs to speak clearly about. That's our only point. No question. All right. Thank you very much, counsel. We kept you up for a long time. Thank you. Okay. We'll give you three minutes, Mr. Collinsworth. Thank you, Your Honor. Where to begin? I would just remind the court again that in terms of the scope of the statute, I read to you the quote of the sponsors of the bill, and they certainly thought that they were going to stop forced labor and trafficking in the global economy with the amendments to the TDPRA. In that same Nestle case, Justice Thomas, who wrote the opinion, was contrasting the Alien Tort Statute with the TDPRA in terms of its scope. And he said, quote, in 2008, Congress created the present right of action in the TDPRA, allowing plaintiffs to sue defendants who are involved indirectly with slavery. And that's Nestle versus Doe in 593 U.S. at 638. All of the legislative history indicates a broad plan to have a tool that would actually stop forced labor and trafficking. And I, with the three minutes, I cannot go into the details of our substantive argument on extraterritorial jurisdiction, but I will note that in our opening brief at 10 to 27, our reply brief at 5 to 14, and the entire amicus brief filed by the legal scholars, we think that 1596 extended these extraterritorial predicates and that that paused 1595's exact same extraterritorial predicates to apply extraterritorially. And if they don't, then certainly 1589B applies here, both to extend it extraterritorially, because 1596 extends all offenses, or 1589B makes the focus of just that, forced labor, benefiting from forced labor domestic. The damages you seek, are they the same for the forced labor and trafficking? We did not break out the different categories of damages, just that they were damaged. Forced labor claim could allow for full compensation of your clients. Yes, Your Honor, certainly. I was asked about unjust enrichment. Let me say that the two best cases we have, we cited page 50 of our opening brief, the JSC Brandsmash holding case, 70 F's up third. And that one and Campbell? And yes, both of them deal with indirect liability, the kinds of issues we're discussing here. And we certainly also discuss section 47 of the restatement, which Judge Millett pointed out as well. That applies directly here. Now, let me just say that, first of all, we have many allegations showing, or alleging that Kimberly Clark and Ansel are benefiting from the forced labor and trafficking by cheating gloves. That's the whole point. Forced laborers don't get paid. So the price of gloves goes down. That's paragraph 47, 108 and 109. We also show. Okay. I think you are over your rebuttal time. And we're aware of when. Thank you for your attention, your honors. I appreciate it. Thank you.
judges: Millett; Katsas; Rao